GILBERTSON, Chief Justice
(dissenting).
[¶ 36.] I respectfully dissent. The lead author’s conclusion that Heinemeyer gained voting residence at the home in Wentworth on November 1, 2006, is not supported by the facts of this case, or the relevant law. Moreover, the question before this Court is much larger and more complicated than whether or not the Board was entitled to refuse to seat Heinemeyer. Instead, we must ask, as did the circuit court below, at all relevant times herein did Heinemeyer maintain a voting residence and his right to vote in Madison, South Dakota, elections, such that he was duly elected by the voters of Madison to the Subdivision 10 seat and never vacated that seat. Otherwise, we have the potential of disenfranchising not only Heinemeyer, but also the sixty percent of the Subdivision 10 registered voters who elected him to that position, without a full and fair review of their right to have their votes counted.
[¶ 37.] We have a strong preference for preserving election results that are “a free *782 and fair expression of the will of the voters.” In re Election Contest as to Watertown Special Referendum Election of October 26, 1999, 2001 SD 62, ¶ 9, 628 N.W.2d 336, 339; SDCL 12-19-34.[7] This Court has previously held when faced with voting irregularities under an election contest that “ ‘a free and fair expression of the will of the voters should not be overturned due to the mistakes or neglect of an election official.’ ” Id. (quoting Becker v. Pfeifer, 1999 SD 17, ¶ 27, 588 N.W.2d 913, 920).
[¶ 38.] While this is not an election contest, the same principals apply whenever we consider whether to overturn the will of the voters. The members of the Heartland Consumers Power District Board appear to have waited until after the election was certified to attempt to deny Heinem-eyer a seat. Given that the Board was aware that Heinemeyer had moved from his prior residence on Jennifer Street in Madison and closed on the Wentworth home before the election, any contest of Heinemeyer’s eligibility to run for office should have been made at that time in order to provide voters with the opportunity to cast their vote accordingly. To permit the Board to wait until after the election to oust Heinemeyer is to overturn a “free and fair expression of the will of the voters” of the Heartland Consumers Power District.
[¶ 39.] There are a few additional facts overlooked by the lead author’s writing that are critical to the outcome of this case. First, Heinemeyer testified he moved out of the Jennifer Street residence to convenience the purchasers. Heinem-eyer did stay at the Wentworth residence during the sixteen days prior to the official closing on the Jennifer Street residence, and the next day rented the apartment in downtown Madison known as 107 North Egan, Apartment 4. Heinemeyer changed his voter registration on January 3, 2007, declaring his residence address as 107 North Egan, Apartment 4 in Madison. There is nothing in the record to reflect any intent on Heinemeyer’s part to make the Wentworth property his address for voter registration purposes.
[¶ 40.] Also overlooked was Heinemeyer’s sworn testimony that he had slept overnight in the apartment for several nights between November 17, 2006, and March 27, 2007, the date on which his deposition was taken in this matter. When asked at the deposition and at trial to quantify the number of nights, Heinem-eyer testified it was less than ten, but could not be more specific.
[¶ 41.] In addition, trial testimony that Heinemeyer kept personal property at the North Egan apartment was also not factored into the lead author’s writing. Personal property kept at the apartment by Heinemeyer included a dining table and chairs, clothing such as sports coats and dress shirts, and kitchen items such as plates and silverware. The fact that Hein-emeyer, and only Heinemeyer, paid all utilities beginning in November 2006, and had paid all rent for the apartment beginning in January 2007 through the trial date in August 2007, is also relevant, although not discussed in the lead author’s writing.
[¶ 42.] If Heinemeyer was a “qualified voter of the district” of Subdivision 10 at the time of the election within the meaning of SDCL 49-36-1, the Office of the Secretary of State’s certification of Heinemeyer as having been elected to the Board of *783 Heartland Consumers Power District for Subdivision 10 must stand. If we answer that question in the positive, then the next question becomes did Heinemeyer create a vacancy within the definition of SDCL 49-36-6 by “removal from the subdivision from which the director was elected.” See SDCL 49-36-6(2).

Heinemeyer was a “qualifted voter” during the election and eligible for the Subdivision 10 seat.

[¶ 43.] SDCL 49-36-11 provides:
No person shall be qualified to hold office as a member of the board of directors of a consumers power district unless he or she shall be a voter of such district or, if such district be subdivided for election purposes as provided in this chapter, of the subdivision of which he or she shall be a voter. No person shall be qualified to be a member of more than one such district board.
(Emphasis added.) SDCL 49-36-1 further provides who is a “voter of such district” for purposes of a consumers power district election:
After the selection of the original board of directors of a consumers power district as provided for in chapter 49-35, their successors shall be nominated and elected and shall take office as provided in this chapter. Qualified voters of the political subdivision or subdivisions whose combined territory composes the territory of a district shall be qualified voters of the district. The nomination and election shall be by separate nonpartisan ballot. The term of each member of the board thus elected shall be six years and until his successor is elected and qualified.
(Emphasis added.) No definition of a “qualified voter” is provided in SDCL Chapter 49-36. Thus, we must turn to the definition of “voter” as provided under SDCL Title 12, and the South Dakota Constitution as to what qualifies a person as a “voter” within the meaning of Chapter 49-36. See SDCL 12-1-1.[8]
[¶44.] Our state affords great protection to a citizen’s voting franchise. SD Const, art. 6, § 19; Duffy v. Mortenson, 497 N.W.2d 437, 439 (S.D.1993) (holding “[i]t is not the policy of the State of South Dakota to disenfranchise its citizens of their constitutional right to vote”). A court must strictly adhere to the constitutional and statutory provisions before disenfranchising a voter. See Bienert v. Yankton Sch. Dist., 63-3, 507 N.W.2d 88, 91 (S.D.1993) (holding strict compliance with statutory scheme was properly followed, and this Court would not “disenfranchise voters because election officials chose a specifically prescribed applicable statute over another statute to which they were not directed” as urged by the plaintiff in that case). Cf. Becker v. Pfeifer, 1999 SD 17, ¶ 22, 588 N.W.2d 913, 919 (holding voters will not be disenfranchised due to an election official’s mistakes, negligence, or misconduct, “unless that conduct has been carried to such an extent as to affect the true outcome of the election and put the results in doubt[,]” as elevating form over substance when the right to have one’s vote counted is at stake is unwarranted).
[¶ 45.] The South Dakota Constitution provides in Article 7, Section 2:
Every United States citizen eighteen years of age or older who has met all residency and registration requirements shall be entitled to vote in all elections *784 and upon all questions submitted to the voters of the state unless disqualified bylaw for mental incompetence or the conviction of a felony. The Legislature may by law establish reasonable requirements to insure the integrity of the vote.
Each elector who qualified to vote within a precinct shall be entitled to vote in that precinct until he establishes another voting residence. An elector shall never lose his residency for voting solely by reason of his absence from the state.
(Emphasis added.) The Legislature further defines voting residence in SDCL 12-1-4, which provides:
For the purposes of this title, the term, residence, means the place in which a person has fixed his or her habitation and to which the person, whenever absent, intends to return.
A person who has left home and gone into another state or territory or county of this state for a temporary purpose only has not changed his or her residence.
A person is considered to have gained a residence in any county or municipality of this state in which the person actually lives, if the person has no present intention of leaving.
If a person moves to another state, or to any of the other territories, with the intention of making it his or her permanent home, the person thereby loses residence in this state.
[¶ 46.] In Treat v. Morris, 25 S.D. 615, 127 N.W. 554, 557 (1910), this Court held that “[a] person who removes from the jurisdiction with the intention of remaining thereby loses his residence, although he afterwards changes his intention and returns; and he cannot vote until he has regained his residence by remaining in the jurisdiction the statutory period.” While reviewed under a prior version of SDCL 12-4-1 that required intent and a period of thirty consecutive days residing in the state to qualify as a voter, the case is instructive in that the person’s intent to remain is of paramount importance in determining voting residence. Id. Removal with intent to remain outside the prior voting district is the triggering event that causes a person to lose his or her original voting residency. Id.
[¶ 47.] In addition to intent, this Court has also stated that a voter’s “voting residency” does not change after an actual change of address until such time as the voter’s name is removed from the registration lists as provided by statute.[9] Bjornson v. City of Aberdeen, 296 N.W.2d 896, 902 (S.D.1980). This is true even if the voter in question has the intent to remove from one precinct within a county and establish a new residence in another precinct within that same county with the intent to remain at the new residence.[10] *785 Matter of Election Contest as to Reorganization of New Effington Independent School Dist. No. 51-3, 462 N.W.2d 185, 191-92 (S.D.1990). This Court’s holding in New Effington Independent School District relied on the language of SDCL 12-18-7.1, which provides in relevant part: “Any person whose name appears on the precinct registration list may vote at that election.” Not until the voters name is purged from the precinct registration list is “voting residence” destroyed. Id.
[¶ 48.] In the instant case, Heinemeyer physically removed himself from his residence at 927 Jennifer in Madison on November 1, 2006, where he was properly registered to vote in the November 6, 2006, election. At the time of his physical removal from the 927 Jennifer property, it was clear that Heinemeyer had no intention to return and live at that physical location. However, he also testified he had no intention of remaining outside of Madison despite taking up residence at the Wentworth home. He evidenced this intent by his conduct on November 17, 2006. On that date, the day after the sale of his former home at 927 Jennifer closed, Hein-emeyer established a residence at the North Egan apartment in Madison.
[¶ 49.] Heinemeyers voter registration filed while he resided at 927 Jennifer remained in effect until one of three conditions was satisfied: 1) Heinemeyer moved out of the county and was required under SDCL 12-4-12 to register in his new county of residence; 2) Heinemeyer failed to vote under the conditions provided in SDCL 12-4-19.4; or 3) Heinemeyer changed his voting address by registering to vote under a new address. None of these conditions were satisfied prior to the November 6, 2006, election.
[¶ 50.] Where Heinemeyer intended to reside, whether at the Wentworth property or at the North Egan apartment, could not at the time of the general election on November 6, 2006, alter Heinemeyers status as a “qualified voter” for Subdivision 10. Heinemeyers registration as a voter was based on his prior, valid Madison residence at 927 Jennifer Street and his name was listed on the precinct role as a properly registered Subdivision 10 voter. Hein-emeyer had not removed himself from Lake County and was not required to register in a new county. Finally, his name had not been purged from the precinct registration used for the November 6, 2006, election per SDCL 12-4-19.4.
[¶ 51.] Thus, on the date of the election, Heinemeyer was both a “qualified voter” of Subdivision 10, and eligible for the board seat for Subdivision 10 of the Heartland Consumers Power District. Heinemeyer carried sixty-percent of the votes cast for the Subdivision 10 seat, was certified as the properly elected official, and was entitled to retain that seat barring conduct that could result in his removal under SDCL ch 49-36.

Heinemeyer actions did not create a vacancy for the Subdivision 10 seat to which he was duly and legally elected.

[¶ 52.] The issue we must next consider is governed by SDCL 49-36-6, which provides how a vacancy is created on a consumers power district board of directors and the method for filling that vacancy. SDCL 49-36-6 provides:
A vacancy on the board of directors shall exist in the event of the
(1) Death, disability or removal from district of any directors;
(2) Removal from the subdivision from which the director was elected; or
*786 (3) Elimination or detachment from the district of the territory in which a director or directors reside.
In the event of a vacancy, the vacancy shall be filled by the board of directors. The Board members of the Heartland Consumers Power District sought Heinem-eyer’s removal under subsection two (2), claiming that Heinemeyer had removed himself from Subdivision 10 to Subdivision 8.
[¶ 53.] The issue of removal turns on the provisions in SDCL 12-1-4, specifically the first paragraph: “For the purpose of this title, the term, residence, means the place in which a person has fixed his or her habitation and to which the person, whenever absent, intends to return” SDCL 12-1-4 (emphasis added). The third paragraph in SDCL 12-1 — 4 is also critical to this issue: “A person is considered to have gained a residence in any county or municipality of this state in which the person actually lives, if the person has no present intention of leaving. ” Id. (emphasis added).
[¶ 54.] “This court has decided that ‘[a] residence is established by personal presence in a fixed and permanent abode, with the intent of remaining there.’ ” Spurlin v. Siebrasse, 74 S.D. 150, 152-53, 49 N.W.2d 604, 605 (1951) (quoting Appeal of Lawrence County, 71 S.D. 49, 21 N.W.2d 57, 58 (1945)). “The words ‘live’ and ‘reside’ are synonymous. They relate to the domicile or place where the person is deemed in law to reside.” Nelson v. Nelson, 71 S.D. 342, 348, 24 N.W.2d 327, 331 (1946) (citing Shaw v. Shaw, 98 Mass. 158, 1867 WL 5728 (1867); Cover v. Hatten, 136 Iowa 63,113 N.W. 470 (1907)).
[¶ 55.] The facts in the instant case show that Heinemeyer had two fixed permanent abodes beginning November 17, 2006, and continued to maintain both at the time he was scheduled to take the oath of office and his seat on the Heartland Consumers Power District Board. Hein-emeyer established a residence at the lake house in Wentworth, a fixed and permanent abode, on November 1, 2006, by removing all his belongings from the Jennifer Street residence and placing them in the Wentworth home and spending all his time away from work at that location from November 1 through November 16, 2006. However, on November 17, 2006, Heinem-eyer established a second residence at the North Egan apartment, another fixed and permanent abode, as evidenced by paying rent and utilities, maintaining personal property, returning on an almost daily basis to the apartment to eat, nap, and shower, and by spending several nights sleeping at the apartment. The question then becomes which of these two residences is Heinemeyer’s “voting residence” within the meaning of SDCL 12-1-4.
[¶ 56.] Our statutory scheme provides no guidance on how to determine which of two residences maintained by a voter is his or her “voting residence.” The only guidance offered under SDCL 12-1-4, in addition to the requirement of a permanent and fixed abode, is the intent of the voter to remain in that abode. This, however, offers no criteria by which to select between two residences.
[¶ 57.] Other courts that have been called upon to decide this issue engage in a two-step process whereby the first step determines whether the voter has in fact two residences. See People ex rel. Madigan v. Baumgartner, 355 Ill.App.3d 842, 291 Ill.Dec. 558, 823 N.E.2d 1144 (2005); Krajicek v. Gale, 267 Neb. 623, 677 N.W.2d 488 (2004); Dilsaver v. Pollard, 191 Neb. 241, 214 N.W.2d 478 (1974). After that question is resolved, then the intent of the voter is considered to determine which of the two is the “voting residence.” Baumgartner, 291 Ill.Dec. 558, *787 828 N.E.2d at 1152; Dilsaver, 214 N.W.2d at 482. Cf. Krajicek, 677 N.W.2d at 495 (lack of physical presence precludes a finding of residence, and thus the second step regarding intent need not be considered).
[¶ 58.] As the lead author’s writing correctly notes, the plaintiff in Krajicek, 677 N.W.2d at 494, failed to establish that the home of his aunt and uncle was also his residence in addition to the home Krajicek shared with his wife and children. The Nebraska Supreme Court utilized a two-part factual test to determine whether Krajicek had established residency at one or more locations: “(1) residence, or bodily presence, in that locality and (2) an intention to remain there.” The facts reviewed in that case included that Krajicek had won the District 8 seat for the Papio Missouri River Natural Resources District while residing in a home within that district, and subsequently moved to a new home outside that district, and his eligibility to remain in office was then challenged. After removing himself from his home within District 8, Krajicek maintained a home with his wife at 7819 South 45th Avenue, Omaha, Douglas County, Nebraska, an address contained within District 10. However, Krajicek claimed his official residence as his aunt and uncle’s home at 4505 Jefferson Street, Omaha, Douglas County, Nebraska, in District 8. He did so by claiming he intended to move into that home at some undesignated time in the future after his aunt and uncle’s occupancy. Id. at 491-92.
[¶ 59.] Krajicek paid nothing toward the upkeep of his aunt and uncle’s home, rather they paid insurance, utilities, and related expenses on the home. Id. at 491. Furthermore, Krajicek returned to his 7819 South 45th Avenue home each night, slept, showered, ate breakfast, left for work and returned from work to that address each night, and maintained all of his personal property at that home. Id. That court held that Krajicek had bodily presence at his address in Subdivision 10, but no bodily presence at his aunt and uncle’s residence within District 8. Id.
[¶ 60.] The key to that holding was that Krajicek presented “no evidence that he resided at [his aunt and uncle’s home at] 4505 Jefferson Street in the sense of being bodily present at that address.” Id. Thus, Krajicek was determined not to have established a residence at the home of his aunt and uncles, and therefore, there were not two residences from which to choose a voting residence. That court held that intent alone without bodily presence was insufficient to establish a residence, let alone a voting residence, and thus he had vacated his office representing District 8. Id. at 495.
[¶ 61.] In sharp contrast to Krajicek, is Dilsaver v. Pollard, 191 Neb. 241, 214 N.W.2d 478 (1974), another Nebraska Supreme Court case. In that case, Dilsaver’s vote cast in a 1972 Loup County commissioner election was challenged based on voting residence. Id. at 481. Dilsaver claimed as his residence a farm in the relevant precinct, which he owned and leased to his son, but upon which he maintained a residence where he had lived since 1923. Id. In 1967 Dilsaver remarried a woman who owned a farm in Custer County at which he also spent part of his time. Id. at 482. No evidence was presented concerning the amount of time spent at each location, nor was any evidence presented to contradict Dilsaver’s expressed intention that his Loup County farm was his residence. Id. In deciding that matter, the Nebraska Supreme Court declined to affirm the trial court’s judgment which was based on the fact that Dilsaver’s wife resided outside Loup County, and a subpoena issued to Dilsaver was *788 returned as properly served at her Custer County farm. Id. Instead, that court held that it could not consider the evidence of the service of the subpoena as it was not a part of the record below. Id. at 483. Nevertheless, that court held that “[o]ne spouse may have a residence separate from the other,” id. (citing Wray v. Wray, 149 Neb. 376, 31 N.W.2d 228 (1948)), and that the intention of the voter as to his residence prevailed in this case for lack of any other competent evidence to suggest Dilsaver did not maintain a residence within Loup County. Id. at 482.
[¶ 62.] The issue of how to determine which of two residences is the voting residence was recently reviewed in Baumgartner, 291 Ill.Dec. 558, 823 N.E.2d at 1147. In that case, the candidate, William Baum-gartner, filed a statement of candidacy and won the election for the county board for Moultrie County, Illinois. He was subsequently convicted “of one count of felony perjury for filing a statement of candidacy in which he allegedly falsely stated under oath that his address was in Moultrie County, Illinois[]” in violation of section 29-10 of the Election Code (10 ILCS 5/29-10 (West 2002)).[11] Id. The conviction resulted in twelve months conditional discharge, a fine of $500.00, and seventy-five hours of community service. Id. Baum-gartner challenged the conviction on appeal claiming the indictment was void because the statute that makes the offense a felony did not provide due process. Id. at 847, 291 Ill.Dec. 558, 823 N.E.2d 1144. Baumgartner challenged the statute alleging it violated his due process rights as the term “residence” was “so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts.” Id. 291 Ill.Dec. 558, 823 N.E.2d at 1149 (quoting People ex rel. Sherman v. Cryns, 203 Ill.2d 264, 271 Ill.Dec. 881, 786 N.E.2d 139, 157 (2003)).
[¶ 63.] The state and Baumgartner submitted different usages for the term “residence.” Id. 291 Ill.Dec. 558, 823 N.E.2d at 1150. The case turned on the issue of intent and which of two residences the candidate intended as his “voting residence.” Id. The state argued that Baum-gartner exhibited more intent to make his permanent or voting residence in Cham-paign, Illinois, where he attended undergraduate and graduate school for a period of approximately ten years, was married, purchased a home, and began raising his family. Baumgartner argued that he never gave up his Moultrie County residence, as he had purchased an 86.7 acre farm with a cousin, acquired his grandfather’s home in Moultrie County, and returned to Moultrie County on average two or three days per week, staying at his father’s home in his old room. Id. 291 Ill.Dec. 558, 823 N.E.2d at 1147-48. He further testified he maintained his voter registration in Moultrie County at all times relevant to the matter. Id. 291 Ill.Dec. 558, 823 N.E.2d at 1147.
[¶ 64.] That court held that “[t]he controlling inquiry in deciding the residence of students, as with all others, is where ‘does the party actually makes his home and claim for the time to exercise the rights of property or citizenship incident to or resulting from permanent residence?” Id. 291 Ill.Dec. 558, 823 N.E.2d at 1151. When a person has two residences, as did Baumgartner, the person
*789 [M]ust make a decision about which location he intends to make his permanent residence. Implicit in the residency requirement of intention to make a place a person’s permanent home is the ability of that person to choose whether he wishes to exercise the rights afforded to a permanent resident in his new location or if he wishes to continue his residence at the home he has temporarily left. As long as he does not seek to “exercise the rights of property or of citizenship incident to or resulting from permanent residence” at his new location but instead continues to exercise those rights, including the right to vote, at his original location, he remains a resident at the original location.
Id. 291 Ill.Dec. 558, 823 N.E.2d at 1151. As that court noted, charging a person with perjury for exercising his choice and picking between his residences “imposes a chilling effect on running for office.” Id. 291 Ill.Dec. 558, 823 N.E.2d at 1152. “If facts are present to allow a person to select between two locations, it is solely the individual's choice that determines where his or her residences actually is.” Id.
[¶ 65.] In the instant case, Heinemeyer was temporarily absent from the North Egan apartment when at work or at his Wentworth residence. He was absent from the Wentworth home when present at work or while spending time at the North Egan apartment in Madison. Hein-emeyer used both locations as residences, choosing to engage in some activities at one residence and other activities at the other. Among those activities Heinemeyer elected to engage in at the North Egan apartment, among many, was the decision to select North Egan in Madison as his voting residence over his residence in Wentworth. Heinemeyer has made no attempt to exercise voting rights based on his residence in Wentworth, nor has he attempted to register to vote under the Wentworth address. Heinemeyer admitted at trial that he obtained the apartment for the specific reason that he wanted to have a residence in Madison and remain as a registered voter. There is no evidence to contradict Heinemeyer’s claimed intent to select the North Egan apartment in Madison as his voting residence, as Hein-emeyer has done nothing inconsistent with his claimed intent.
[¶ 66.] The lead author’s writing assumes that the “proper question is not where Heinemeyer intends his voting residence to be, but whether Heinemeyer has any present intention of leaving the home in Wentworth, where he actually lives.” However, the lead author’s writing has glossed over the fact that Heinemeyer actually lives at both addresses. His split of time between the two may be skewed toward the Wentworth home, and the Madison apartment is certainly more modest in comparison. But neither of those two facts can alter the fact that Heinemeyer maintains both residences. The determining factor is not the amount of time or the number of amenities at any particular location. The determining factor to establish a voting residence from our case law, and from those jurisdictions that have considered the issue of selecting between two residences, is intent.
[¶ 67.] Thus, the proper question is: Where does Heinemeyer intend his voting residence to be? He has clearly announced his intention. Our constitution does not permit the courts to force a voter with two residences in two separate voting districts into one or another of those districts in contravention of a clear and unequivocal expression of the voter’s intent. That choice belongs to the voter.
[¶ 68.] The effect of the Court’s decision today is to disenfranchise thousands of voters who voted for Heinemeyer in this election. This was over sixty percent of *790 the total votes cast. There is no claim by the Board of any irregularities either by the voters who cast their ballots for Hein-emeyer or the officials who ran the election. At the end of the election process with the ballots counted, no one had any complaints about its legality. The people have spoken. However, the Court today sets a new standard for residency, or in the case of the concurrence a new standard for domicile, which in effect reverses the will of the majority of the Heartland voters. Apparently, because Heinemeyer did not sleep a sufficient number of nights in his apartment in Madison, the voters who cast their votes for him made a trip to the polls for naught. In the end their vote meant nothing. In a day when vast numbers of our citizens do not bother to vote because they think their vote does not count, today’s decision sends a chilling message reinforcing that unfortunate concept.
[¶ 69.] The circuit court’s order granting the writ of mandamus should be affirmed.
[¶ 70.] MEIERHENRY, Justice, joins this dissent.

. SDCL 12-19-34 provides: "No mere informality in the matter of carrying out or executing the provisions of this chapter shall invalidate the election or authorize the rejection of the returns thereof, and the provisions of this chapter shall be liberally construed for the purposes herein expressed or intended.”

. SDCL 12-1-1 provides: "The provisions of this title shall apply to all elections for state, district, and county officers and other officers except in cases where from the context of any statute a different intention plainly appears.”

. There are two methods whereby a voter’s name can be removed or cancelled from voter registration rolls. First, a voter who moves between states or counties is required to cancel a previous registration under SDCL 12-4-12. Second, a voter who is placed in the inactive registration file and who subsequently fails to vote “by the second general election following the confirmation mailing, the registration shall be cancelled.’’ SDCL 12-4-19.4.

. While the requirement in SDCL 12-3-4 that a voter must vote in the precinct in which that voter resides was repealed in 1973, the election in the case of Matter of Election Contest as to Reorganization of New Effington Independent School Dist. No. 54—3, 462 N.W.2d 185, 191-92 (S.D.1990), turned on whether voters were residents of the school districts involved in the consolidation vote. Precinct registration rolls were used to identify whether voters resided in one of the two school districts involved in that election. Id. Only those voters with voting residences in either the Effington School District or the *785 Sisseton School District were permitted to vote in that election. Id. at 186-87.

. Section 29-10 of the Election Code provides: “Any person who makes a false statement, material to the issue or point in question, which he does not believe to be true, in any affidavit, certificate[,] or sworn oral declaration required by provision of the [Election] Code shall be guilty of a Class 3 felony.” Baumgartner, 291 Ill.Dec. 558, 823 N.E.2d at 1149 (quoting 10 ILCS 5/29-10 (West 2002) (alterations in original)).